IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR449 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA BARKER |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH J. COFFEE, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Michelle M. Baeppler, First Assistant United States Attorney, and Carol M. Skutnik, Assistant United States Attorney, respectfully submit this memorandum setting forth the United States' position regarding the sentencing of Kenneth J. Coffee (hereafter "Coffee" or "Defendant"). Coffee pled guilty to Count One of the Indictment on May 4, 2022, pursuant to a Plea Agreement. Count Two will be dismissed at the time of the sentencing. Sentencing is scheduled for September 14, 2022.

The final Presentence Investigation Report issued August 22, 2022, calculates Coffee's advisory Guidelines range at a level 34, after acceptance, with a Criminal History Category I. (R. 27: Sealed PSR, PageID 103-4). This results in an advisory sentencing range of 151 to 188 months. (Id., PageID 107). For the reasons set forth below and those to be articulated at the sentencing hearing, the United States submits that a sentence withing the properly calculated Guideline range is sufficient but not greater than necessary to comply with the principles of sentencing.

1

**I.     COFFEE ENGAGED IN DEEPLY DISTURBING BEHAVIOR THAT SEXUALLY EXPLOITED CHILDREN**

1. <u>Coffee actively participated in Kik groups that trafficked in child pornography.</u>

In 2019-20, the Milwaukee Division of the FBI conducted an undercover investigation into several groups on Kik Messenger[1] that were devoted to the sexual exploitation of children. During that investigation, FBI TFO Michael Sewall, posing undercover as a 34-year-old woman, became a member of the public group titled "YoungH/urt." Members of that group then invited TFO Sewall into several private Kik groups where members actively engaged in the dissemination and discussion of child pornography. One of these groups was titled "Young Share."

TFO Sewall observed the activity in the Young Share group and noticed a user by the name of "Mocasix," later identified as Kenneth Coffee, commenting on child pornography images posted by others. On February 11, 2020, at approximately 2:19 pm, TFO Sewall observed Coffee post a video to the group which depicted a little girl, approximately 6 – 8 years of age, undressing and exposing her vagina. Coffee was observed posting child pornography to

---

[1] Kik Messenger, commonly called "Kik", is an instant messaging application owned by MediaLab.AI, and is available for free on iOS and Android operating systems. Kik uses a smartphone's data plan or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username. A Kik account can be opened using an email address and password, but no phone number is required. Its main functions include one-on-one chatting; sending messages, videos, pictures, and gifs; and group chats (up to 49 other users), as well as anonymous chatting. Kik also offers internal applications through its browser to encourage users to remain within the Kik app, including "Match & Chat" and "Flirt!". Kik is known for having features that preserve its users' anonymity; however, Kik logs user IP addresses. Kik is well known to law enforcement as an application used by child pornographers to receive and/or distribute child pornography.

the group again on February 18, 2020, at approximately 12:42 pm.  This image depicted a young girl, approximately 6 – 8 years of age, grabbing an adult male's erect penis with her hand.  TFO Sewall also observed Coffee post a child erotica video to this group which depicted a girl, approximately 10 years old, pulling her top up to expose her breasts.  All the while, Coffee offered sexually explicit comments on other user's posts.

Kik provided subscriber information and IP logs associated with username "Mocasix" in response to a subpoena.  The response indicated the account was opened on an Android device with an unconfirmed email address of "1988monstermoca@gmail.com."  Kik also provided Internet Protocol ("IP") logs for the period of December 29, 2019, through January 27, 2020.  Investigators concluded that Coffee primarily connected to Kik via Mobile-LTE IP addresses.  One of the IP addresses commonly used by Coffee resolved back to his father's account in Willoughby, Ohio.  The email address used to create the Kik account also connected Coffee to the "Mocasix" account.

Prior to obtaining a search warrant for the Defendant's residence, agents reviewed Coffee's Facebook page.  Coffee posted that he was in a relationship with C.C.  Further research indicted she had three young children in the home.  On October 24, 2019, the Eastlake Police Department conducted a "Welfare Check" at her apartment and discovered Coffee was babysitting the children.

2. March 23, 2020, Residential Search Warrant

On March 23, 2020, a federal search warrant was executed at Coffee's apartment in Eastlake, Ohio.  Coffee, C.C. and two children (ages 4 and 2) were present when agents made entry.  A black LG cellphone and an Apple iPad tablet were seized from the bedroom and later subjected to a forensic examination.  Coffee agreed to be interviewed by FBI SA Sullivan and

Eastlake P.D. Det. Kroczak and stated that he lived at this apartment with his girlfriend for only a few weeks and he previously lived with his parents. He also informed the agents that the youngest child in the apartment was his.

Coffee admitted using Kik Messenger and the username "Mocasix" in groups where child pornography was traded. He stated he would save some of the images that were posted in the group on his phone and then share them with other members in private rooms. Coffee further stated that some of the images he posted depicted adults or teenagers while others were of children. Some of the children did not have pubic hair or developed breasts. Coffee also described some of the images and videos that he shared as children engaged in sexual activity with adults or other children. He estimated that he posted 30 images/videos on Kik and had about 10 to 20 images/videos on his phone. He further denied ever engaging is sexual activity with a child and claimed he did not remember posting in the group that he wanted to have sex with a 6-year-old girl.

Coffee's LG cellphone was examined and found to contain evidence of 43 images and 9 videos of child pornography. A sample of those files are described as follows:

- Image File Name: Thumbdata3--1967290299_Embedded_290
Description: Two prepubescent females, both being approximately 6 years of age, both being completely nude, one standing upright while the other is bent over at her waist, exposing her genitalia.
- Image File Name: Thumbdata3--1967290299_Embedded_334
Description: A prepubescent female, being approximately 8 years of age, lying on a bed with her legs spread apart exposing her genitalia, holding an adult male's penis in her left hand.
- Video File Name: 1584679803352.db0174b9-0e52-4a78-bf72-3a0091647573
  Date Modified: 03/20/2020 @ 4:46:32 AM (UTC +0)
  Length: 1 minute 13 seconds
Description: A prepubescent female, being approximately 8 years of age, being completely nude, wearing a red mask which covers her eyes, lying on her back on a bed with her arms appearing to be bound, while an unknown person masturbates her with a sexual device. The victim also appears to urinate during the video.

4

## II. APPLICATION OF § 3553(A) FACTORS

The recommendations of the Sentencing Guidelines are no longer mandatory but sentencing courts "must consult these Guidelines and take them into account when sentencing." United States v. Booker, 543 U.S. 220, 264 (2005). The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" Kimbrough v. United States, 552 U.S. 85, 108 (2007) (quoting Gall v. United States, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process"). The sentencing court must conduct a two-step process: first calculating the sentence using the advisory Sentencing Guidelines, and then applying an individualized assessment under the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). United States v. Boulware, 604 F.3d 832 (4th Cir. 2010). These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

18 U.S.C. § 3553(a).

### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

"An offender's pornography and erotica collection <u>is</u> the single best indicator of what he wants to do." KENNETH V. LANNING, OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, CHILD MOLESTERS: A BEHAVIORAL ANALYSIS-FOR PROFESSIONALS INVESTIGATING THE SEXUAL EXPLOITATION OF CHILDREN, 107 (5TH ED. 2010). As evidenced above and in the

5

PSR, Coffee sought out and found an online community that supplied a never-ending cache of child pornography images. He used these groups to stockpile images and videos that he could use in other groups like child pornography currency. The images he coveted focused primarily on early prepubescent girls engaged in oral sex or the lascivious display of their genitalia.

The Government refers to the Statement of Facts section above and the Defendant's PSR for the complete summary of the nature and circumstances of the offenses in the case at bar.

    B.    <u>HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

        1.    <u>Coffee's self-reported history</u>

The PSR discusses at great length Coffee's familial history, his mental and emotional health, substance use, and his employment history. (R. 27: Sealed PSR, PageID 104-06). He is 34 years-old and in good general health. (Id., PageID 105). He graduated from high school and attended some classes at the Auburn Career Center. Prior to his arrest he worked as a delivery driver for several different companies. Following the execution of the search warrant, he moved back home with his parents and continued to work. (Id., PageID 105).

Records indicate Coffee was adopted at the age of 12 after several foster care placements. He describes abuse and neglect while he was in the foster care system and has received mental health counseling since he was a teenager. (Id.). Coffee has a son from a prior relationship but does not have contact with him. He also has a daughter with C.C. but is not in contact with her either. (Id.). His prior criminal history involves an assault on C.C. (Id., PageID 103).

    C.    <u>NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT</u>

Sexual abuse causes long-term trauma and pain to child victims. <u>See</u> <u>United</u>

6

States v. Irey, 612 F.3d 1160, 1206 (11th Cir. 2010). This sentencing factor contemplates "just desserts," answering the need for retribution so that the punishment fits the crime, and the defendant is punished justly. Id. at 1206. The Irey Court cited the Senate Report regarding the significance of this provision:

> This purpose—essentially the "just desserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75–76, 1984 U.S.C.C.A.N. 3258-59). Id.

Similarly, in Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense and provide for any general or specific deterrence. United States v. Bistline, 665 F.3d 767-68 (6th Cir. 2012). A sentence below the advisory Guidelines range would offend the seriousness of the offense and the impact on its victims. Congress has plainly indicated "[e]very instance of viewing images of child pornography represents a . . . repetition of their abuse." 18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)). The words of Congress and many courts echo the victims themselves. For many victims, the fact that people download their images is just as traumatic as the initial act of abuse. These victims have expressed embarrassment for being depicted in these extremely vulnerable situations. They also express fear of being watched and subsequently recognized by people like Coffee who fixate on videos and images of them.

In December 2012, the United States Sentencing Commission submitted a comprehensive report to Congress on child pornography crimes including the harms experienced by child

pornography victims.  United States Sentencing Commission, Report to Congress: Federal Child Pornography Offenses, Ch. 5 Victims of Child Pornography (December 2012).

The Commission explained that "[c]hild pornography victims face other types of victimization that are separate from the harm of production.  Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images."  Id. at 112. The Commission emphasized that, unlike child sex abuse victims whose abuse was not memorialized, child pornography victims experience a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder.  Id. at 113.

On October 18, 2013, the American Professional Society on the Abuse of Children issued this Statement on the Harm to Child Pornography Victims:

> For the victims, the sexual abuse of the child, the memorialization of that abuse which becomes child pornography, and its subsequent distribution and viewing become psychologically intertwined and each compound the harm suffered by the child-victim. Some children are shown pornography as part of the conditioning and desensitization process generally known as "grooming". Other children are aware that the abuse is being captured as photographs or movies. Some of the child sexual victimization that is photographed and/or video recorded are then distributed worldwide on the internet. There is presently no way to destroy these pornographic images and/or videos from the internet and the external media where they may be downloaded, stored, and further distributed.
>
> The production of child pornography necessitates the sexual abuse of the child. As the Supreme Court correctly pointed out, in addition to the effects of child sexual abuse…victims of child pornography often experience an exacerbation of harms and/or additional problems. These may include shame, embarrassment, fear of being identified, vulnerability from having their abuse filmed, fear that adults are viewing and being sexual with

8

> themselves or other children, and the realization that the image of their abuse will last forever on the internet.

<u>APSAC Statement on the Harm to Child Pornography Victims</u>, Adopted October 18, 2013 (Available at *http://bit.ly/APSAC-Statement*).

Studies on victims of child pornography also indicate that the child's original psychological harm continues into adulthood and impacts their ability to form healthy relationships with others. John E.B. Myers, et al., <u>The APSAC Handbook on Child Maltreatment</u> (2d ed. 2002). The symptoms of distress exhibited by child victims of sexual abuse continue after the actual sexual exploitation to the time of disclosure and into the post-traumatic phase as well. <u>Id</u>. at 59-62. In cases of online child pornography, where the crime is perpetuated by the continual circulation of the child's images, these symptoms of distress are likely to continue with each new distribution and possession.

In other words, the victims in this case suffer distinct and perpetual harm from the acts committed by the Defendant. A sentence that minimizes such incredible harm does not reflect the seriousness of the crime or provide just punishment.

    D.    <u>NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE</u>

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. <u>United States v. Irey</u>, 612 F.3d 1160, 1206 (citing <u>United States v. Ferber</u>, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); <u>Osbourne v. Ohio</u>, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing

demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.  Receiving and distributing child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.).  In United States v. Goldberg, 491 F.3d 668, 672 (7th Cir. 2007), the court opined:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Bistline Court reversed a district court that failed to see any importance in general deterrence. See United States v. Bistline, 665 F.3d 758, 767 (6th Cir. 2012).  The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case."  Id.  The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" Id.  (citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

Even though the Defendant and others who have a desire for young children *may* not be deterred, it is also true that others would certainly not be deterred if the Defendant received an insignificant sentence.  Offenders interested in sexually exploiting children talk to one another via the internet, and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, use cloud storage, and use anonymous phone apps to prevent

10

detection. There is much to be gained by a significant sentence—increased safety for our children.

      E.      THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

This is the factor involving the incapacitation or specific deterrence of the defendant that the court is to consider. See Irey, 612 F.3d at 1210. Congress and this Circuit have recognized that sex offenders have a high rate of recidivism. Notably, the Sixth Circuit stated in United States v. Richardson, 349 Fed. Appx. 38, 44 (6th Cir. 2009), that there are, "long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Richardson, 349 Fed. Appx. 38, 44 (6th Cir. 2009) (quoting, H.R.Rep. No. 108-66, at 49-50 (2003) (Conf.Rep.), reprinted in 2003 U.S.C.C.A.N. 683, 684.).

As Judge Posner wrote:

> We need evidence-driven law just as we need evidence-driven medicine. Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children. R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1). Some studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent. Ryan C.W. Hall & Richard C.W. Hall, "A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues," 82 Mayo Clinic Proceedings 457, 467 (2007). Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years. Angela W. Eke, Michael C. Seto & Jennette Williams, "Examining the Criminal History and Future Offending of Child Pornography

> Offenders: An Extended Prospective Follow up Study," Law & Human Behavior, Nov. 19, 2010 (tab.1), www.springerlink.com/content/h4616862621x8616/ (visited June 23, 2011). United States v. Garthus, 652 F.3d 715, 720 (7th Cir. 2011) (emphasis supplied).

Further, these estimates of recidivism may be low, as is acknowledged as a limitation by Eke, Seto, & Williams, "Our reliance on official records for both criminal history and re-offending may have limited the strength of the association that we could find, as both are underestimates of true offending." Eke, Seto, & Williams, "*Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-Up Study*," Law and Human Behavior 17 (2011). And they admit that, "[h]istorical cases of sexual contact offenses, especially those committed by child pornography offenders who appeared to have no prior criminal history, may provide a window into undetected sexual offending, i.e., offenses that were not (at the time) reported to police or documented in file information." Id.

Therefore, since recidivism is defined in terms of subsequent arrests, low numbers of contact offenses based upon arrests is not surprising. These results are explained by multiple factors. First, child molesters do not boast about their crimes to the public, but only between themselves. Second, victims of sex crimes are reluctant to report such crimes because children are particularly reluctant to talk about sexual abuse. Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)); see e.g. Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)). Therefore, any study which relies on subsequent arrest and convictions should be considered with caution.

The issue of recidivism begs the question of whether someone with a sexual attraction to children can be rehabilitated. Pedophilia generally is treated with cognitive behavioral therapy. See, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues, Ryan C. W. Hall, Md, and Richard C. W. Hall, Md, PA, Mayo Clin. Proc. (April 2007). The therapy may be prescribed alone or in combination with medication. Id. But unlike the successful treatment outcomes for many other mental illnesses, the outlook for successful treatment and rehabilitation of individuals with pedophilia is guarded. Id.

F. THE KINDS OF SENTENCES AND THE SENTENCING RANGE ESTABLISHED FOR CHILD EXPLOITATION OFFENSES

Coffee faces the following statutory penalties and an advisory Guidelines range of 151 – 188 months for an Offense level 34/Criminal History category I:

| Count | Statute and Description of Offense | Statutory Sentence Per Count |
|---|---|---|
| 1 | Title 18 U.S.C. § 2252(a)(2) Receipt and Distribution of Visual Depictions of Real Minors Engaged in Sexually Explicit Conduct | Maximum imprisonment: 20 |
| | | Minimum imprisonment: 5 |
| | | Maximum Statutory fine: $250,000 |
| | | Minimum period of supervised release: 5 years |
| | | Maximum period of supervised release: lifetime |
| | | Special assessment: $100 + $5,000 |

The Government would further note that sentencing statistics maintained by the U.S. Sentencing Commission encompass a wide range of offense conduct, including conduct less serious that Coffee's case. According to the USSG, Appendix A (Descriptions of Datafiles and Variables), the following types of crimes are grouped into the child pornography category:

> Child Pornography includes the receipt or possession of materials involving the sexual exploitation of minors. This category includes offenders sentenced under §§**2G2.2** and 2G2.4 (deleted) of the Guidelines Manual.

Id. at A-6.

This means that statistics for people who receive and distribute child pornography are grouped with individuals convicted of just possession.

### III. SIGNIFICANT SUPERVISED RELEASE IS REASONABLE AND APPROPRIATE

Regardless of the term of imprisonment, this Court should impose a term of supervised release beyond the mandatory minimum. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." United States v. Johnson, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. See United States v. Granderson, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. See United States v. Irey, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term reference contained in U.S.S.G. § 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. See H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release for sexual offenders); see also supra (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate in some cases, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. See H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N.

683, 684. A significant term of supervised release would be reasonable and appropriate in this case to achieve rehabilitative objectives and to protect children from further victimization by the Defendant.

### IV. MONETARY PENALTIES

#### A. THE AMY, VICKY, AND ANDY CHILD PORNOGRAPHY VICTIM ASSISTANCE ACT OF 2018 (AVAA) GENERALLY

The Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA), enacted on December 7, 2018, made several changes to existing child pornography laws, specifically regarding restitution. Specifically, the law: (1) provides that restitution must be ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim; (2) imposes a new special assessment for those defendants who are convicted of certain child pornography related offenses; (3) permits victims of child pornography trafficking offenses to seek a one-time payment of $35,000 from a reserve fund; (4) amends the definition of "sexually explicit conduct" under 18 U.S.C. § 2256(2); and (5) adds 18 U.S.C. § 3509(m)(3), which allows victims, their attorneys, and any purported expert to access a victim's own sexually explicit images during any criminal proceeding.

The images recovered from Coffee's devices were submitted to the National Center for Missing and Exploited Children ("NCMEC") for comparison with their national database of images possessed and trafficked around the United States. Only 2 of the images possessed by Coffee involve children that have previously been identified by law enforcement. That means that the children depicted in the remainder of the images have yet to be rescued and/or identified. The victims from the 2 identified series in the NCMEC report did not submit restitution requests in this case.

B.  FINE

The Government submits that Coffee does not have the ability to pay a fine in this matter.

C.  18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Coffee <u>was</u> subject to a mandatory $5,000 additional Special Assessment pursuant to 18 U.S.C. § 3014 at the time of his Indictment and at the time of his plea. The statute, which states in pertinent part:

> [I]n addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes) ...

18 U.S.C. § 3014(a) (emphasis added), was created to fund the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). However, 18 U.S.C. § 3014 is set to expire on September 11, 2022, and it is unlikely be extended prior to Coffee's sentencing because Congress is out of session until September 13, 2022, and the extension is not currently set for a vote. Therefore, unless extended by Congress in the interim, Coffee should not be ordered to pay the JVTA assessment.

16

## V. CONCLUSION

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that this Court impose a prison term at or near 151 months (the low end of the advisory Guideline range).

          Respectfully submitted,

          MICHELLE M. BAEPPLER
          First Assistance United States Attorney

By:   /s/ Carol M. Skutnik
      Carol M. Skutnik (OH: 0059704)
      Assistant U.S. Attorney
      801 West Superior Avenue, Suite 400
      Cleveland, Ohio 44113
      Tel. No. (216) 622-3785
      E-mail: carol.skutnik@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on September 7, 2022, a copy of the foregoing Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Carol M. Skutnik
Assistant U.S. Attorney